All right, the final case on the docket for this morning is People v. Dittenber. Clause number 5-10-0608. And whenever you're ready, Mr. Anderson, you may proceed. Good morning, Your Honor. I am Eddie Anderson for the defendant, Mr. Todd Dittenber. May I please report, counsel, Mr. Dittenber is appealing his conviction for child abduction. And we argue on appeal that the evidence is insufficient to support his conviction. I'm not going to talk about the second argument. The Illinois Supreme Court has resolved that issue. So my argument will be focused on the first argument, which is about. This is an appeal your case, partly because the child abduction law is an unusual law in that it is one of the rare laws that treats the attempt to do an act the same as the completed act. Attempting to lure or bring a child into a vehicle or building is treated the same as the completed act of having the child in the vehicle or building. In this instance, it's clear that all the state argues was that there was an attempt. It's also peculiar because Brooklyn, Illinois is an unusual place. It's a small town with a lot of house. Brooklyn is a town of about 700 people right by the Mississippi River in St. Clair County, just north of East St. Louis, just south of Venice. It's in the industrial swath along St. Clair Avenue, Illinois Highway 3. Physically, if you can picture it, it's about a 5 by 7 block grid of land where 700 people reside. But in that 5 by 7 grid, there are, at least at the time of trial, four strip clubs, a great many bars and taverns, and the record indicates from the testimony of the police detective, open street prostitution. In fact, it's notorious for this device that's available in Brooklyn. People come from all over the region for the activities, the nightlife. Are there church there? Mm-hmm. Isn't there a church? Yeah, there are churches. Forget that. Here's the point. The residential area of Brooklyn is more on 6th and 7th Street. The vice area is on 3rd or 4th Street. What does that mean? There's only about two blocks between where the vice is and where the residential area is. Mr. Dittenberg is not from the Metro East. He's not from Illinois. He's a construction worker from Ohio who had come to Illinois for the work that was available, I believe it was one of the steel mills, doing some bricklaying. So he doesn't know Brooklyn. He doesn't know what is the residential area, what is the vice area. What he does know is where Roxy's Strip Club is, and he knows Shannon, a woman who works at the club. And the information in the record shows that Shannon called him, told him she was going to meet at Roxy's, and he decided to go there to see her. This was on a Sunday afternoon. It's a cold day. He's driving to the club. He gets there, doesn't see that she's there. He drives through the town. And as he's driving through the town, he sees a woman, he sees a person walking along the street. Now, what does he see? He sees a, according to the police detective again, a reasonably well-proportioned young woman. She's 5'6", between 140 and 160 pounds, walking along the street. She's wearing a hooded coat because it's cold. And, again, the man's not familiar with the town. He stops at an intersection. He calls to her, asks her if she wants a ride. She says no. And he then continues and says, no, really, it's cold. Do you want a ride? And she says no. He follows her off the street a ways. She walks up to a house. He comes around the block, sees her, and again asks if she would like a ride. She declines and goes to her aunt's house, and he drives off up to the club. We know he's at the club because the young woman was upset by this man speaking to her and spoke to her family members at the church. And her aunts and friends of her aunts went up in the area of the clubs and saw his vehicle parked at Roxy's. Well, apparently Shannon wasn't at Roxy's yet because the aunts and the family members of the community church services and Mr. Dittenberg comes back through the town again. And we know from the interrogation that he was hoping to find a woman to ask to have sex for money. He was trying to solicit an act of prostitution, which is a classic humanist demeanor. But he wasn't trying to solicit a child. He wasn't trying to abduct a child. And I think the fact that he drove back through the town again makes it very evident that he had no clue that the person he spoke to was a child. If he'd known he'd upset a child, that she was not out on the street anymore, he'd have a pretty good reason to think he might be in trouble. But the state says that the mistake of age under Douglas is not available in this case. How do you respond to that? Well, they also acknowledge that it hasn't really been used in a child abduction case. And they agreed to the instruction on the mistake of fact as a defense. And our argument is that, well, first of all, it hasn't been applied to the law. And second of all, that's wavering. In fact, it's just a procedure of default, essentially. So my point was that he drove back through the town again. And he couldn't have known that he was doing something that would result in police activity against him. So it's our condition that the evidence is insufficient to prove that he was attempting to lure a child for an unlawful purpose. He thought he was speaking to an adult woman. Again, RV is 5'6", weighs between 140 and 160 pounds. The detective, Paris Johnson, says she was a reasonably well-proportioned young woman. So Mr. Denver's activity that day was the effort to solicit an adult woman for a sex act, which, again, class B misdemeanor, not a class 4 felony. Was there any attempt to submit that as a lesser-included offense? I mean, it went to the jury just on the class 4 felony, right? Yes. And in this instance, having put forth the affirmative defense of mistake of fact in the instructions, it's on the stage to do something to rebut the defendant having a reasonable belief that RV was an adult. And in this instance, they didn't do anything to do that. And as we've discussed, the state feels that they don't have to prove a mental state on age. But again, the case law doesn't support that. And essentially, they defaulted when they agreed to the instruction. Mr. Denver was not attempting to abduct a child, and there isn't sufficient evidence to support the verdict in this case. And for that reason, we'd ask your Honor to reverse the conviction. Thank you. Thank you, Mr. Anderson. Mr. Anahan? May it please the Court? Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. This case presents a question of the sufficiency of the evidence to establish whether or not basically what it comes down to is whether the defendant knew that Robin, the young girl in question, was a girl. In 1979, the United States Supreme Court in Jackson versus Virginia set forth the standard that is still the one that we use in sufficiency of the evidence cases. That standard has recently been reiterated in Cavazos versus Smith last year at the United States Supreme Court, which says that the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational prior effect could have found the essential elements of the crime beyond a reasonable doubt. Cavazos, saying basically the same thing last year, said only if no rational prior effect could have agreed with the jury. In the state's brief we cite to this Court's decision in People versus Lemke, it says that this Court should not substitute its judgment for that of the jury in cases where facts could lead to either of two inferences unless the inference accepted by the jury is inherently impossible or unreasonable. Now, in the defendant's reply brief, he seems to take issue with this Court's language. I assume that he is taking issue with the inherently impossible or unreasonable language. I briefly reviewed case law this morning in preparation for this case. I found that exact same language in sufficiency of evidence cases in the Illinois Supreme Court and all four of the districts. So it's just that is the standard, that unless no one, no jury, could reach this decision, unless the decision is inherently impossible or unreasonable, then this Court should affirm. The most important thing in this case, the most important evidence, is Robin. Robin was at the trial. She testified. She was about 16 1⁄2 at the time of the trial. And a picture of her at the time that this occurred, when she was just barely 15, was also presented as evidence. And was that picture, and I haven't seen these pictures, but was that a picture of her wearing what she was wearing? No. It's just a school picture? I think so. It's an 8 by 10. It's a big picture. It's a clear picture. But it's a picture of her at the age that she was when this happened. Fifteen, right? Pardon me? Fifteen. Fifteen. Yes. The jury saw Robin at 16 1⁄2. The jury saw Robin at 15. So I think that's huge. That in and of itself, I think, is sufficient to support this. I would note that the jury was instructed in its instruction that the defendant was not mistaken as to a matter of fact that would show that he did not have the intent necessary for the charge. Did she say she was going to church? Yes, she was going to church. Was she told that to the defendant or not? I don't remember. It's a trap. I don't remember. Certainly, she was very close to the church when this happened because after this happened, she was so unnerved by it that she ran into her church. That's where she was headed. I think it's also very important that the first time that the defendant saw Robin, he was, I believe, about 15 feet away from her. But then when he came around again, he was five feet away from her. Robin very clearly sees the defendant from the front, from the face, just as clearly as you would see her in the picture that's in the record. Regardless of the coat she has on, he's looking her right in the face at this time. She's looking him right in the face. And from five feet away, regardless of what he saw from the back when she's walking, regardless of how tall she is or what she weighs, when she's five feet away from him and she's seeing his face, so he's seeing her face, he should have known how young she was. Although she had the hood up on her jacket, the record clearly indicates that her face was not obscured in any way. So you put all this together, that's certainly enough that a rational jury could conclude that Robin was a child and the defendant should have known Robin was a child. I think it's also important that Brooklyn's a small area, but all the strip clubs are in one little area. And then you get downtown where the church is, where the residences are, and so he's been downtown, he's seen Robin. He's been back over to where the strip clubs are. He comes back a couple of hours later looking for somebody tricking him. And he admitted that part of the reason that he returned to this residential area, rather than the area of Brooklyn where the strip clubs and prostitution is common, is because he thought Robin might be there. And this is after he'd been five feet away from her. He admitted that Robin looked nothing like a prostitute. Nevertheless, he returns looking for her again. He knew she was a child. The jury was convinced he knew she was a child. That's probably what he was looking for was a child. I diverge from the record. But I think equally important is the testimony of Detective Johnson. Detective Johnson was the pastor of the church that Robin attended. And he saw, he testified that Robin, he did not think Robin looked like an adult. Now, the defendant describes this testimony as self-serving. But, as I said, Detective Johnson has been a minister for 20 years. He was the senior pastor for Robin's church. He is a detective with the Brooklyn Police Department. He's known Robin for three years. And how that makes any of his testimony self-serving, the defendant does not explain. As a sworn officer of the law, as a man of the law, and as a witness under penalty of perjury, he has no reason to be anything but truthful. He had no personal interest in the defendant's conviction, and his testimony was not self-serving. There is much made of some comments that Detective Johnson made while he was interviewing the defendant. Where Detective Johnson says, well, gee, I'm going to paraphrase here. I can see why you thought that. Detective Johnson clearly testified at trial that these comments, along with other comments he made, were interrogation techniques. That he had been taught to do this, to draw out a witness to, if you agree with him, then he thinks you're on his side and he might tell the truth. And so, again, in the reply brief, again, the defendant says, oh, well, the brief, the cases cited by the state say that that's not always allowed. That's not the question here. The question is not whether this was allowed. The question was, why did Detective Johnson make the comments? Detective Johnson made the comments as an interrogation technique in an effort to get the defendant to say, yes, she did look like an adult, but I realize she wasn't. He said other things about her. He said that a witness had seen him. That's not true either. Very clearly, just a technique that he had to try and draw out. He comments that he's interfering him alone, so he has to kind of play good cop and bad cop both at the same time. The other thing is, it's important when you watch this DVD that Detective Johnson never said that Robin looked older when looking at her face. He said that when he saw her from the back. And later on, in that same interrogation, he told the defendant that after the defendant spoke to Robin and circled the block upward again, that he should have known Robin was a child. And I think that's what it all comes down to. It's one thing to see someone from the back wearing a coat and think, that's an adult. But when you turn things around, five feet away from each other, and there's no reason to think otherwise, then there's certainly nothing there. I would like to very briefly touch. Thank you. Sorry, your time is up. It's in my brief. That was very brief. Mr. Anderson. I'll just work my way down through what counsel talked about. Of course, credibility is a question for the trier of fact. But this court wouldn't be as busy as it is if it weren't also true that the jury determinations are not always final word. Where evidence is unreasonable, improbable, unsatisfactory, if some reasonable doubt remains of guilt, courts of review have the ability to reverse a verdict. Just as much as Jackson v. Virginia says that, there's a wealth of case law that enables courts of review to review the satisfactory miss of the evidence. Your Honor, I asked if R.B. spoke to Mr. Dittenberg that she was on her way to church. No. There's no indication that that happened. She simply declined, shook her head when asked if she wanted a ride, and they had very little verbal exchange. One thing we do know that R.B. said is that he was polite. He wasn't aggressive. He didn't try to block her path. He didn't try to pull her into the vehicle. He's in a van. She's walking on the street, initially 20 feet away, not 15. And, yeah, they were closer later, I believe the second time they came around the block. But she's still up in a van. She's down on the street. And, again, reasonably polite, not aggressive. It's true, as counsel pointed out, that he did come back through the town again a second time. And counsel points out that, yeah, he was in the residential part of the town, not up by the clubs. But, again, it's a five-by-seven area, a five-block-by-seven block. You're two blocks from the heart of town when you're up in the corner of the town where the vices are. If you're not from there, it doesn't take very long to go two blocks down a street and be in a very different neighborhood. He's not from there. He doesn't know that. He did come back through looking for somebody who was tricking. But he did that because he didn't know he had solicited a child. He didn't know he was going to be in trouble for doing something that, even in a town that has open street prostitution, is beyond the pale. Counsel complains that I characterize the detective's testimony as self-serving. I want to be clear that I'm not saying that Detective Johnson was lying in what he said to the court. The sense of self-serving is the same as any witness, certainly an arrested police officer, has an interest in validating his action. When he arrests someone, he'd like to see them convicted. When a witness appears for one side, he would like that side to prevail. Any witness who is supporting the side has an interest and is served by his testimony being taken as true and being accepted and is validated by that. So in that sense, it's self-serving in that he's an arresting officer. He'd like to see a conviction occur. He's a pastor of this girl. He would like to see his belief about what happened validated. So he's going to spin his version of what he did, how he did it, in the light favorable to the state's position. And that's the sense I mean, self-serving. Certainly not that he's foisted on the court. Nevertheless, I think if you do look at the entirety of the interrogation and you look at the trial, there are troubling aspects of Detective Johnson's interrogation. And it's pretty clear that Mr. Dittenberg's activities that day were the effort to solicit a sex act and in no sense an effort to try to abduct a child, try to have sex with a child. And for that reason, we've asked that this court reverse that conviction. Thank you both for your briefs and arguments. We'll take this matter under advisement and issue a decision in due course.